May it please the Court, Mark Rackman of Davis and Gilbert on behalf of the appellant defendants Sears and Young and Roebuckham. May I reserve two minutes for rebuttal? Yeah, you try to keep track of the time and we'll try to help you and then we'll see what happens. Thank you, Your Honor. I'm going to try to focus on just certain issues on Sears' appeal because there are a lot of issues before this Court and it's I think a better use of everyone's time if I just focus on what Sears believes are the main issues here. Focusing first on the issues, the issue of protectability of a plaintiff's plastic wishbone. Both at the summary judgment stage and at trial, the evidence submitted by both sides should have dictated a verdict in favor of judgment and verdict in favor of Sears on the issue of whether a plaintiff had a protectable copyright in its wishbone design. Based upon this Court's holdings in cases such as Sadova and Apple as well as the Supreme Court's holding in Feist, the copyright owner has to establish first that it has put in non-trivial, non-functional elements to its design that are not dictated in this case because it was a design based upon an item occurring in nature, not dictated by the physiology of the item in nature or the process used to make that item. In this case, there's no dispute that what Lucky Brick did was a two-step process, the first being scanning an actual real turkey wishbone. That was done by a company called Symtec. There's no dispute that that process itself is not protectable. And on summary judgment, Symtec's deposition was submitted to the district court, and the owner of Symtec who did that scan testified that all he did was take the turkey wishbone and apply his machine to that turkey wishbone, which created a three-dimensional image of that wishbone, which he handed off to Lucky Brick. There's no evidence in this record either at summary judgment or at trial because the next step, the mold maker who took that scan, there's no evidence that he did anything or participated in any way with the scanning process. In fact, he didn't. There was no supervision by him. And this is Dale Hillsland, the mold maker. His company is called Paraflex. So what Symtec did cannot be protectable. And because of that, it was plaintiff's burden to establish that. You say Symtec, yet there was the second guy. What did he do? Paraflex. What he did, and it's only on the summary judgment stage because he did not appear at trial, so the jury could not infer that he did anything at trial. But at summary judgment stage, all he did and testified to was taking, he did two things that he testified he did. He took that scan, and this is in the record at ER 668 and as well 745. He took that scan and did only two things to the scan before creating what were called graphite electrodes. He first, he says, mirror imaged it. He says he only got half of a wishbone, and so he mirror imaged what he got from Symtec to make a full wishbone. Now, that mirror imaging is actually what's referred to as symmetry. It's a functional element of plaintiff's wishbone. It can't function unless it has two sides. Plaintiffs actually concede in the record that they are not seeking protection in symmetry. That's in ER 676. So that step was not protectable. And then he says he put in a parting line. The parting line was required to create the mold pieces. The mold has to have two sides to it, and the parting line indicates where the two pieces break. Again, a completely functional element added by Mr. Hillis-Landon, not protectable under cases like this Court has decided in Lampless and Hogan's. Once he did that then, it's undisputed that he took that image, created through a machine two graphite electrodes, and took hand tooling to those electrodes. And the hand tooling did what? Well, the hand tooling at his deposition, he says, he rounded and smoothed edges, because it's undisputed that this wishbone was designed to be held by people and broken. It's a completely utilitarian item. We submit that on that grounds alone. Did he say that he wanted it to make it sleeker looking and he thinned it down so it would be ergonomic? Yes, for holding. That's right, Your Honor. And that's our point. If the purpose of it was to make it able to be held or better held by a person. What about looking sleek? Doesn't that have an aesthetic component to it? But it has to be non-trivial. And that's where I think their case falls off the rails. The triviality here is established on multiple levels. But first, their own expert in avian osteology, who they relied upon solely at trial for establishing protectability. Well, once the district court said, once the summary judgment was entered, that issue was no longer before the jury. So no evidence regarding it had to be presented to the jury, did it? Respectfully, Your Honor, they still had to establish protectable elements copied with virtual identity. What the district court failed to do in granting summary judgment in their favor of protectability, was identify what those protectable elements were. We believe that actually was error, that under Apple, it was the court's role to filter out the protectable and unprotectable and identify them. But the district court said, I'm not going to do that. Whatever may be protectable, it's from what Mr. Hillsland did by hand. He didn't hold on summary judgment that whatever Mr. Hillsland did to the scan was protectable. And we know he only did two things that can't be protectable. But putting that aside, it was the plaintiff's burden at trial to establish the protective elements copied by a defendant with virtual identity. To do that, they had to identify the protectable elements. And they couldn't do that because they didn't put Mr. Hillsland on the stand. All they put on the stand was Dr. Steadman, who before trial admitted that no layperson would notice these differences unless pointed them out by someone like him. And on the stand, he said, only him and about 12 other of his colleagues would notice these differences. That established triviality. And we know that also Mr. Hillsland himself couldn't identify at his deposition what he did by hand. When we showed him a picture produced by him, a printout of a three-dimensional image of the wishbone, we asked him, is this before you did your hand alterations or after? If he had done anything that was not trivial, he would have been able to say. But he couldn't tell us. He had no idea. Do we know what those pictures were? I mean, pictures are often different from physical three-dimensional actual things. Do we have in the record the pictures that you showed him? Yes, they're in the record. And I can get the site to the court. We can find it. If they're in the record, we can find it. Another point on this, though, Your Honors, is at trial we were able to establish for the first time what the SimTech file itself looked like, because we produced that file late in the stage of the case after summary judgment. It's in the record as ER 624-31. We know it's a SimTech file, and no reasonable juror could conclude otherwise, and we believe that the court erred in finding that the juror could infer that Mr. Hillisland did anything in this file, because, A, of its date, it's dated December 22, 2003, before Mr. Hillisland admittedly did anything by hand. That didn't start until January of 2004. And, B, we know what Mr. Hillisland did electronically could not have created the elements that are in 624-631, which includes every element that Dr. Steadman testified was different, and that's all he testified to, was different between the final wishbone created and the natural wishbone. He didn't know who made those differences. Again and again I asked him, do you know who did this? He could not say. He had no knowledge of who created the differences. He didn't know if it was created by a machine or a person. If it's created by SimTech, which we submit 624-631 established, then it can't be protectable, whether or not Mr. Hillisland takes credit for it, which he can't, because he didn't supervise SimTech. In addition to the date of that document, the title of that document is wish.igs from SimTech. All the evidence pointed that this was a SimTech file. It came from Lucky Break. Mr. Roney testified at trial he got, he admitted he got an electronic file from SimTech. He also at ER444 testified he does not know if he got one from Paraflex. So the jury couldn't infer that this file came from Paraflex. It had to infer that it came from SimTech, and based on that, there had to be a verdict in favor of Sears for non-protectability, because this file established that nothing that Mr. Hillisland did by hand was non-trivial. Now, if we get past this question of protectability, is there any serious dispute as to whether your client copied the wishbone of Lucky Break? No, that's not on appeal here. That's not disputed? Your client did copy that? That's what the jury found, and we haven't appealed that finding. I'm asking slightly differently. Do you dispute that the jury was wrong and you're not appealing it, or you just concede that your client copied it? Quite honestly, Your Honor, we didn't have enough evidence in our possession to make a determination of that, but we take the jury's decision that copying was done as the law of the case. But copying on its own is not enough, as Your Honor's know, especially with virtual identity of protectable elements. Of course. Focusing now on damages briefly, the jury awarded two types of damages. The first was actual damages. The second was indirect profits. With respect to actual damages, our main contention here is that the plaintiff failed to put on any evidence of the fair market value of the wishbone design and the product warning. Those were the two pieces of actual damages the jury's found for. All the jury found, and we know what they did, is they equated 19 cents per wishbone for the design based on quotes from Lucky Break that were between 19 cents and a little higher, but those quotes included things unrelated to the wishbone design, including the manufacturing of the wishbone, packaging, printing, labeling, all things unrelated to these. Counsel, what case authority do you have to support the proposition that we should try to remanufacture the damages calculation? Well, we have Polar Bear that talks about a jury's apportionment, and this is going to indirect profits as well. We have Polar Bear and Frank Music that went into changing the awards to the plaintiff, and we also have an Eighth Circuit case called Andreas, which did the same thing. But you're telling us how the jury calculated the damages, but there was no interrogatory that let us know how the jury actually calculated the damages. Is there? No, Your Honor, but there's only one way they could have gotten to these numbers, because they're not even numbers, and if you apply the number of wishbones times the 19 cents, you get to the exact dollar for actual damages. For the product label, they didn't have any fair market value. Plaintiff's counsel actually urged the jury to punish the defendants. They didn't put any evidence of fair market value and asked for between $5,000 and $10,000 to punish us. What the jury awarded was $30,000. So there's clearly no basis for that. With respect to indirect profits, we know from the record ER-584, if you add up on that spreadsheet, which is all the revenues that were generated from the redeeming of a coupon, that's where they got their claim for profits was not from. For which date? For the Sunday through the Wednesday before Thanksgiving, a $10 off coupon. So this is not the 19th you're talking about, the dates where they were asked for. Right. This is for where the award was. The $1,479 came to the dollar, the total of what's called coupon margin at ER-584. That is the gross sales for those dates, less the cost of those goods, less the $10 coupon. That's it. No apportionment whatsoever. And this is a thin copyright case. The plaintiff under the statute, under 504-B, is only entitled for profits attributable to the infringement. The infringement in a thin copyright is only of the protectable parts of the work. It's undisputed that we were not. So in your view, how should the damages have been calculated by the jury? Well, first of all, to establish causation, they had to establish that damages were attributable to the infringed elements. We know that they didn't do that because their own experts said no one would even notice these. So no consumer. Well, if we disagree with you on that point, then how should the damages have been calculated? Well, if they're relying upon to establish causation a report that was produced by us that showed that 42.7 percent more coupons were redeemed in that period than a period a month later, well, as an initial apportionment, that 42.7 has to be used because if it was what they get to get to causation, then it has to be applied to this coupon margin. In addition, you have to take out the unprotectable elements of the wishbone, which at trial we established at least 17 elements. But the jury didn't agree on that. How are we supposed to know whether or not the jury agreed on which elements you thought were unprotectable? Only six were claimed to be protectable by plaintiffs, and there's numerous elements. We counted up at least 17 at trial. There's even more. So you looked at each part of the wishbone and numbered it and said that the jury should apportion for what? The six that they claimed. At the best, they get six because that's what they put on. And we actually only counted up 17 because that's what was at trial, but there were more. I mean, this is a piece of plastic with, as you'll hear from plaintiffs, the little things that they're talking about, you could line up 100 different things to claim here. In addition, it's the court's role to make sure that the apportionment is just and reasonable. That's under Cream Records and Frank, and this apportionment was not just and reasonable. Now, once the item is considered protected, what case most strongly supports your argument that you have to parcel out the protected and the nonprotected parts of the item? The Frank Music case is in this court, Your Honor, where, by the way, there is no case in this court or any other court that talks about indirect profits for a thin copyright. This is a case of first impression on this issue. The Frank Music case is a little different because, you know, in a song you have a, you know, you know what the melody is that's been taken from a different tune. It's pretty finite and definitive. Well, but the song was part of a play, and so the court apportioned what it found through the record was attributable to that song as part of a larger work, just like we have six pieces of the swishbone claimed to be protectable, and if we take the jury's verdict as is, those six parts were copied with virtual identity, and the rest is not. I'm not sure that translates perfectly, but I understand your point. Okay, why don't we, you're over time, why don't we hear from the other side, but we will give you a chance to respond. Thanks, Your Honor, and with respect to Y&R, unless there's questions, we'll rely on those. I think your brief was quite clear on that point. Okay, thank you. May it please the court. My name is Mark Walters. I'm counsel for the plaintiff appellee and cross-appellant Lucky Break Swishbone. I'm here with my colleague, Mr. Dario McElite. Lucky Break does not claim to own all plastic swishbones. Sears could have made its own swishbone, but it decided not to. Sears raises a number of issues, but time permitting, I'd like to focus on three. Number one, the district court's originality finding of summary judgment. Number two, what happened at trial. And number three, the damages. And in that third portion, I believe I can cover our cross-appeal. On the district court's originality determination, the legal standard here is admittedly low. It's set forth in Feist, two-prong test, independent creation with at least minimal creativity. Now, this court said in North Coast that the originality requirement is little more than a prohibition on copying. There was some discussion about what Mr. Hillsland actually did. If you look at the record, which is his summary judgment declaration, which was unrebutted on summary judgment, paragraph 7, ER 670, most of the differences between the original natural wishbone and the Lucky Break wishbone were both deliberate and intended to make the Lucky Break wishbone more appealing aesthetically. Now, if the other side had evidence to suggest that these differences were driven by functional considerations, that they were somehow existing in other plastic wishbones, or that by saying the Lucky Break wishbone is protectable, you're conferring a monopoly on Lucky Break in the plastic wishbone market, then that was their chance to do so then. What about opposing counsel's reference to your expert's testimony that most people could not tell the difference between a natural wishbone and the plastic wishbone? I say it's irrelevant, Your Honor, to the originality requirement. The law by design avoids making determinations of artistic merit or worth. What we do as lawyers and judges is we look at these works objectively, and we figure out, was there independent creation? What did the framers mean when they put that provision into the Constitution that said we're going to protect for limited times the work of authors? We're not going to protect just the works that we believe are worthy. We're going to protect them all as long as there's some result that they came from a creative process. So that's the essence of originality, and that existed here. And not only did it exist, but it existed on a summary judgment record that left no genuine issue of material fact. Now, on the SimTech file, that wasn't part of the summary judgment record. It came up after we rested our case, and the district court judge heard arguments from both sides as to when it was produced. He agreed with us, and they haven't shown that he abused his discretion. He agreed with you, and you had said what? We had said that we had produced it early on. I guess what? Produced this file that they claim is from SimTech. And they claim that they didn't get it done much later, which then excused them, in their view, from presenting it so late. That's correct, Your Honor. Now, as for what happened at trial, this is the first I've heard that they're not challenging the verdict on the sufficiency of the evidence, so I'm going to skip that part of my outline. The sufficiency of the evidence on what? On the infringement question, because that's what I think I heard from Mr. Rackman. Well, what I heard was that he doesn't challenge whether they copied. That's not necessarily the same thing as infringement. Okay. Well, yes. Okay. Thank you, Your Honor. That brings us to the point where he says that you had the obligation to show which elements of the wishbone were protectable. Do you agree with that? Your Honor, whether or not an element is protectable is a determination based on facts relating to merger and scenes of fare. That is, whether this particular element is more in the nature of an idea or more in the nature of expression. What we put on at trial was evidence from an expert in ornithology who identified a number of differences, seven differences, between the original natural wishbone that served as a model and the Lucky Break wishbone, and it found all of those seven differences in the Sears wishbone. Now, they're protectable. Now, taking that point, your opposing counsel says that, then, the damages should have been apportioned just to whatever was attributable to those seven different points. Do you agree with that? Absolutely not, Your Honor. And where do you draw the line? I mean, you could, if you want to say seven over how many total, what's the denominator? I mean, if we get into a jurisprudence where we're allowing this apportionment based on, well, was it the beat that made somebody like the song, was it the rhythm, or was it the melody? You don't parse out the pieces of a protectable work. There has to be some reasonable basis to conclude that a piece drove the sale. So when we're talking about profits under Section 504B, is it reasonable to assume that a piece of the wishbone, as apart from the protectable elements, is the reason why it's had promotional impact? No. But there are other things about the promotion that could be factored in in apportionment. And that's what happened in Frank Music. There was a director that had a particular way of putting together that play. There were performers that were giving that play, and they contributed. They were the reason that some people came to see that show. So those presented reasonable arguments for apportionment. But it's unreasonable to think that somebody bought this wishbone or was interested in this promotion, rather, because of a piece of the wishbone. They were interested in the whole wishbone. And that is not a good argument. Moving on to the damages portion. There's a challenge to actual damages in this case. The legal standard of recovery is that it can be based on a lost license fee. And that comes from this court's decision in Polar Bear. Sears chooses to focus on a lost profits measure of damages, but the jury awarded a lost license fee. And one of the challenges is that this is just a quote that Sears didn't actually accept Lucky Break's quote. But in Polar Bear, the defendant in that case was described as being in no better position to haggle over the license fee than a common thief. Sears, having chosen infringement over paying Lucky Break's price, is in no better position to haggle over what that license fee ought to be. The record clearly supported what the jury found, 19 cents per wishbone, 3 cents per warning. And if an infringer, especially one with big resources like a Sears, if they're limited to damages to just what the copyright holder's profitability is, there'd be a lot more infringement, I submit, because it's cheaper for them to make it than it is for a small firm. How about the indirect damages? Okay, let's move on to indirect profits, Your Honor. This court has repeatedly held that, quote, profits indirectly gained from infringements used in promotional efforts fall squarely within the rubric of wrongful profits. That comes from Polar Bear 384F3 at 708. There's a two-part burden-shifting scheme that exists in Section 504B for the recovery of profits. First, the copyright holder establishes the existence of a causal relationship between the infringement and some ascertainable revenue stream. Second, the infringer proves its deductions and an apportionment of the revenue from that revenue stream that is attributable to factors other than the copyrighted work. It's meant to be an advantage to plaintiffs. The legislative history on this point is very clear that the policy behind Section 504B is one of deterrence. So this causal connection requirement is not meant to be insurmountable for plaintiffs. It's actually meant to provide us with an advantage. Now, in this case, Sears says there's no evidence of a causal connection between the infringement and these coupon redemption sales, but the evidence is clear that they had a much higher redemption rate. These coupons that were attached physically to their wishbone, they were redeemed at a 43% higher redemption rate than any other similarly situated coupon that year. Now, opposing counsel represents that a request was made for the jury to punish his client. Do you agree with that? I don't think so, Your Honor. I don't agree with that. Lastly, what's that? I believe what we said in closing, Your Honor, was that you should send a message that it's not okay to choose infringement over paying someone's price. Was there a dollar amount attached to that statement? I don't remember. I do remember hearing $5,000 or $10,000, but I don't think that there was a punishment motive or anything. But there is a deterrent policy, and that's in the House report under Section 504B. And on the November 19th sales, which is a part of our cross-appeal, there is no case reported that has such a close connection than this case does between the actual physically handing a wishbone to a customer in exchange for a purchase. This wishbone acted as an incentive. To me, this is the thinnest part of your case because it presupposes that people came in or bought something to get the wishbone. Well, Your Honor, the polar bear is clear that it doesn't have to be the main factor, the only factor. It just has to be a factor. And we don't need to show exactly how many people were motivated by it. We just need to show evidence upon which a juror could conclude that it's reasonable to assume that somebody was interested by this. Now, companies don't give away things at sales out of the goodness of their heart to their customers. They do this because they want to motivate and influence purchasing decisions. To me, that argument is persuasive for the people who retrieved the wishbone coupons. But people came into the store. They had to come into the store to get the wishbone. So they were coming to the store. People weren't told they would get a wishbone before they came to the store, were they? Well, that's what makes this case so great, and that's what makes this case more like the trade show sales in polar bear and less like the isolated infringement scenario at issue in Mackey. In polar bear, there was a loop tape that was going on about kayaking at a trade show. And this court held that because Timex was interested in creating in the minds of customers this image of an outdoorsy kayaking thing, that this copyrighted work had the ability to influence their purchasing decisions. Now, I'm not saying that every single person who made a purchase on November 19 was influenced by this wishbone giveaway, but certainly some were. Now, Judge Rollins asked you a question that I think you may be in the process of answering, but I want to make sure it doesn't slide away. She asked you whether they were induced to come into the store in the first place because of the availability of the wishbone. Thank you, Your Honor. I think that was your question. That's right. And to answer your question, Judge Rollinson, there was this advertisement that was distributed with an infringing image the day before. And it really doesn't matter whether or not there was an infringing image in that advertisement. The fact is there were 39,350,000, one for half of the households in all of the country, that told them in a Friday newspaper to come to Sears on Saturday and take advantage of this offer. Am I right that the picture that appeared was a picture actually of the prototype wishbone of your plant? I think it was, Your Honor. It had those little ejector pins. And they were in a raised format. But, Your Honor, the point I would like to make here is a very important one, and that is that people knew about this. People knew that, hey, guess what? They're having this big promotion at Sears tomorrow, this cute little idea. Why don't we get Johnny's winter coat for Christmas early and not wait until Black Friday, which is the busiest shopping day of the year? That was the whole intent of this program was to encourage people to come in early. These days before Black Friday, they're some of the slowest days of the year because people are waiting until the sales. But this was a gimmick. It was a carefully planned strategy to encourage people to come into Sears on the 19th. And what was the causation evidence? Is that the one that was excluded, the evidence that was excluded by the court? That's correct, Your Honor. And that's part of our cross-appeal. And it was excluded in a way that it converted a motion in limine to one for summary judgment. And if this court is inclined to agree with us on that particular issue, I want to make sure that district courts have the ability to prepare their cases for trial. This comes up a lot in my trial practice. There are issues that sort of fall off the wayside. But on a major issue like this, parties need the minimum notice on Rule 56 and an ability to submit all their evidence or at least warning that – You have an opportunity to make a proffer. We did, Your Honor. But we had put our stake in the ground with our objection, our procedural objection to the procedure. And there was not enough time for us to marshal all of our evidence. This was right before trial, and we weren't – Well, right before trial, you should have all of your evidence. Well, that's right, Your Honor. But there are only so many hours in the day. But there wasn't procedurally any warning given that this was officially going to be converted to a motion for summary judgment, and we ought to marshal our evidence at that time. Now, if we were to agree with you that the testimony – Dr. or Mr. Belch? Dr. Belch. Dr. Belch. If we were to agree with you that Dr. Belch's evidence was wrongfully excluded, what next? I mean, what do we do about that? Well, Your Honor, what we're asking for is a mandate from this court affirming judgment and then a remand with instructions to award additional damages. And there would be proceedings, and I believe Dr. Belch's testimony should be admitted in those proceedings to figure out what portion of sales from the November 19 are reasonably attributable to the infringement. But how can we determine that the evidence that was excluded would have made a difference? And that's the problem with the record is we don't know what he would have shown that would have made a difference, and that's part of the party's responsibility to make sure the record includes what would have been presented if the opportunity had been provided. And that's due in part to the procedural irregularity of this order, Your Honor. If there were a proper noted-up summary judgment motion, I would go to the rule, I need affidavits, I need answers to interrogatories in order to survive. And that creates the record. There's a practical reason for that. Even during the trial, you have an opportunity to make a proffer regarding evidence. We did make a proffer on Dr. Belch. It's in our trial brief about what he was going to say. It's in the record? It is in the record, Your Honor. Yeah, it's in our trial brief. So he was going to say what? He was going to say, I am a Ph.D. in consumer behavior. I have an education that's unique. I have experience that's unique. I conducted a survey using the wishbone in this case and the advertisement to figure out the level of interest from a typical consumer. And then what I also did, I'm speaking as Dr. Belch now, I apportioned the impact that I believe, in my expert opinion, this infringing activity had on sales on November 19. And there was no analysis under Rule 702 to exclude Dr. Belch, none at all. It was based on an improper, burden-shifting belief by the district court. What do we judge the judge's ruling on this, under what standard? The district judge said this looks like guesswork and speculation to me, and on that basis he excluded. Is that an abuse of discretion standard under which we judge whether the district judge was right? I believe so, Your Honor. It's an abuse of discretion standard, the decision to exclude Dr. Belch. Was it sort of a daubert? There was a daubert motion made, but the reasons for exclusion, if you read them carefully, are based on a misapplication of the burdens under Section 504B. And what this court has said is that when a court misapplies or uses an incorrect legal standard, it abuses its discretion. And I think Judge Dilley is one of the most careful judges that we have here. And when they happen in this motion in limine context, we're trying to all get ready for trial and we're trying to do the right thing, things like this can happen. And I think that it was an incorrect decision and it ought to be reversed. Okay. Now, we took you over time. Why don't we give you two minutes to respond? Thank you, Your Honors. First, the Hill is Land exhibit is ER 978. Okay, thank you. With respect to the SimTech file, I think it's just important to note that we're not just relying upon it on a motion to reconsider. It was in evidence at trial, so it's also a basis for our judgment as a matter of law. And on the indirect profits, plaintiff does have an advantage under the scheme set forth in Polar Bear and other cases, but plaintiff is not entitled to a windfall. And if you heard what counsel for the plaintiff said, is it doesn't matter whether they're protectable or unprotectable. People were attracted by the wishbone. Well, that's not what the statute requires. It has to be attributable to the infringement. In a thin copyright case, the infringement does not include the nonprotectable elements. But if that's the right answer, there's almost never going to be a serious order of damages in a thin copyright case. Well, that may be the case, but certainly in this case it's the case because we know that no one made a purchase because of these protectable elements. How do we know that? Well, there's no evidence of it, and the only evidence, I'm sorry, the only evidence in the case is the opposite from plaintiff's own expert, that no one would have noticed these differences. And these differences, when you look at the wishbone, are unnoticeable. Mr. Hillsland himself couldn't identify them. In addition, under Polar Bear and Mackey, the plaintiff's theory of damages can't be speculative. Dr. Belch, under case law in this circuit under 702, his methodology has to be supportable. The district court, I think, went through line by line Dr. Belch's court. They had a Daubert hearing in order to flesh out exactly how the expert opinion was derived. Well, we had his deposition. We put in the motion to eliminate. They did not seek a Daubert hearing. On this idea that they didn't have notice, our motion to eliminate was made about over 30 days prior to the court's ruling on it. They had not only an opportunity to put in papers to oppose it, they had an opportunity to put in a proffer, and then they still had additional time. So they had over a month. And finally, on indirect profits, what they're claiming in the Saturday sales, there's just no evidence of any link to anyone coming into the store on that Saturday and making a purchase because of the picture of the wishbone in the circular. Just like Mackey found that the picture of the artist's sculpture and the symphony's brochure on its own standing alone is not enough, similarly in this case it was not enough just to say because it was in that circular, an eight-page circular which had numerous items on sale, that that established causation. So it wasn't just the flyer focused on the wishbone. It was a circular with many items. That's correct, Your Honor. If you look in the record, it was an eight-page circular in the left-hand side, which took up about an eighth of the first page, was not just a picture of the wishbone but a description of the offer, which was the coupon. That's what drove people in, if anything, to get it was the coupon itself. The coupon is not part of their protectable copyright. And in addition, we had evidence, circumstantial evidence, which puts this case outside of polar bear on the evidence, which was that this promotion didn't work. We have in the record an actual document called the Postmortem at ER 615, which said that people were indifferent to the offer in the stores. In polar bear, they not only had an expert to say, I know these trade sales, these booths and trade shows generate sales, but they had a successful promotion. In this case, Belch didn't even have experience in either circulars or giveaways. He admitted at his deposition he had no such experience, and there's no testimony that this promotion was a success. In fact, the testimony was that it wasn't. Thank you, Your Honors. Thank you. Thank both sides for nice arguments. The case of Lucky Break Wishbone Corporation v. Sears Roebuck & Company is now submitted for decision. The next case on the argument calendar is Shepard v. Foremost Insurance.
judges: Alarcon, Fletcher W. , Rawlinson